UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTINE ZILCH,<br><br>                         Plaintiff,<br><br>         -against-<br><br>ALASKA COMMUNICATIONS SYSTEMS GROUP INC., WILLIAM H. BISHOP, DAVID W. KARP, PETER D. AQUINO, WAYNE BARR JR., BENJAMIN C. DUSTER IV, and SHELLY LOMBARD,<br><br>                         Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Christine Zilch ("Plaintiff"), by her undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is an action brought by Plaintiff against Alaska Communications Systems Group, Inc. ("Alaska Communications" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Alaska Communications, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of Alaska Communications by affiliates of ATN International, Inc. ("ATN") and Freedom 3 Capital LLC ("Freedom 3" and together with ATN, the "Buyers").

2.      On November 3, 2020, Alaska Communications, Macquarie Capital and GCM Grosvenor (together, "Macquarie") announced that they had entered into an agreement and plan of merger, pursuant to which Alaska Communications would merge with and into Macquarie. Pursuant to the terms of the original Merger Agreement, Alaska Communications' shareholders would be entitled to receive $3.00 per share in cash.

3.      On January 4, 2021, Alaska Communications and the Buyers announced that they had agreed upon an alternative transaction (the "Proposed Transaction"), pursuant to which Alaska Communications would terminate the merger agreement with Macquarie and GCM Grosvenor in favor of an agreement and plan of merger with the Buyers, pursuant to which Alaska Communications would merge with and into the Buyers (the ("Merger Agreement") and Alaska Communications' shareholders would be entitled to receive $3.40 per share in cash (the "Merger Consideration").

4.      On January 25, 2021, in order to convince Alaska Communications' public common stockholders to vote in favor of the merger with the Buyers, the Defendants authorized the filing of a second materially incomplete and misleading Schedule 14(a) Preliminary Proxy Statement (the "Proxy") with the SEC.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Alaska Communications' financial advisors, B. Riley Securities, Inc. ("B. Riley" or the "Financial Advisors") regarding the Proposed Transaction.

6.      The Proposed Transaction is expected to close in the second half of 2021 and the special meeting of the Company's shareholders to vote on the Proposed Transaction will be scheduled in the coming weeks.  Therefore, it is imperative that the material information that has

been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise her corporate voting rights.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Alaska Communications' public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, the Company's common stock trades on the NASDAQ Composite exchange (the "Nasdaq"), which is headquartered in this District rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Alaska Communications common stock.

12.     Defendant Alaska Communications is a Delaware corporation with its principal executive offices located at 600 Telephone Avenue, Anchorage, Alaska.  The Company is a telecommunications fiber, broadband, and managed IT services provider, offering technology and customer solutions to residential, business, and wholesale customers in and out of Alaska.  The Company's common stock trades on the Nasdaq under the ticker symbol "ALSK".

13.     Defendant William H. Bishop ("Bishop") is, and has been at all relevant times, the Company's President and Chief Executive Officer, and a director of the Company.

14.     Defendant David W. Karp ("Karp") is, and has been at all relevant times, the Chair of the Company's Board of Directors.

15.     Defendant Peter D. Aquino ("Aquino") is, and has been at all relevant times, a director of the Company.

16.     Defendant Wayne Barr, Jr. ("Barr") is, and has been at all relevant times, a director of the Company.

17.     Defendant Benjamin C. Duster, IV ("Duster") is, and has been at all relevant times,

a director of the Company.

18.     Defendant Shelly Lombard ("Lombard") is, and has been at all relevant times, a director of the Company.

19.     The Defendants identified in paragraphs 14 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

<u>**SUBSTANTIVE ALLEGATIONS**</u>

**I.     Background of the Company and the Proposed Transaction**

20.     Alaska Communications is a publicly traded Delaware corporation that provides telecommunications fiber, broadband, and managed IT services, offering technology and customer solutions to residential, business, and wholesale customers in and out of Alaska, and provides telecommunication services to consumers in the most populated communities throughout the state. The Company's common stock trades on the Nasdaq under the ticker symbol "ALSK."

21.     The Company's facilities-based communications network extends through the economically significant portions of Alaska and connects to the contiguous states via Alaska Communications' two diverse undersea fiber optic cable systems.  Its network is among the most expansive in Alaska and forms the foundation of service to its customers.  Alaska Communications operates in a largely two-player terrestrial wireline market.

22.     Prior to the announcement of the Proposed Transaction, Alaska Communications had excellent growth prospects.  Although Alaska Communications estimates its market share to be less than 25% statewide, its revenue performance relative to its largest competitor suggests that Alaska Communications is gaining market share in the markets that it serves, with third-party market studies indicating that Alaska Communications' market share close to 40% for "near net"

opportunities, that is, within one mile of its fiber network.

23.     On November 4, 2020, the same day the original merger with Macquarie was announced, Alaska Communications issued a press release entitled *Alaska Communications Reports Third Quarter 2020 Results*, which announced a strong quarter, stating in part:

> "Our results for the third quarter reflect execution of our strategic initiatives to deliver industry-leading telecommunications products and services. Prioritizing superior customer service and fiber-based network solutions, we have established Alaska Communications as a premier provider. We continue to strengthen our fiber infrastructure, to facilitate our multiyear transition to IP-based services, and to evaluate means to increase our access and core network. This includes optical transport network upgrades to our subsea Northstar fiber resulting in a capacity increase of over five times, as well as securing CBRS spectrum in 135 cities ranging from southeast Alaska to the North Slope. Our biggest strengths in 2020 have been to manage the unexpected, quickly offer customers solutions, and continue to drive ahead adding many route miles of fiber. In addition to benefiting our customers, we are creating opportunities.

> "Also, after years in development, in October, we went live with our new business and operating systems that will enhance the customer experience through streamlined ordering process; improve business analytics and reporting; and simplify operations that we expect to yield expense savings and drive operational excellence in coming years. We are committed to connecting the people and businesses of Alaska and beyond, investing in our future and driving growth to benefit our constituents. We are very excited about the future," said Bill Bishop, president & CEO.

24.     Indeed, after the original merger with Macquarie was announced the Buyers, recognizing Alaska Communications' excellent prospects, engaged in a hostile bidding war with Macquarie.

25.     Thus, the Proposed Transaction comes at a time when Alaska Communications' future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" Alaska Communications' stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

26.     Despite Alaska Communications' intrinsic value and growth prospects, the

Individual Defendants are agreeing to a merger that cashes out Alaska Communications' stockholders and deprives them the ability to partake in Alaska Communications' growth. The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the original merger agreement with Macquarie, which contemplated a grossly inadequate merger consideration, and further breached their fiduciary duties by agreeing to the Proposed Transaction for the unfair Merger Consideration and allowing the unfair and flawed sales process to unfold in the manner that it did rather than restarting the strategic review process, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

## II.     The Proposed Transaction

27.     On November 3, 2020, Alaska Communications and Macquarie issued a joint press release announcing their merger agreement:

### ALASKA COMMUNICATIONS ANNOUNCES DEFINITIVE AGREEMENT TO BE ACQUIRED BY MACQUARIE CAPITAL AND GCM GROSVENOR IN $300 MILLION TRANSACTION

ANCHORAGE, Alaska—(BUSINESS WIRE)—Nov. 3, 2020—Alaska Communications Systems Group, Inc. (NASDAQ: ALSK) ("Alaska Communications" or the "Company"), together with Macquarie Capital ("Macquarie"), and GCM Grosvenor ("GCM"), through its Labor Impact Fund, L.P., announced today that they have entered into a definitive agreement pursuant to which the Company will be acquired by an affiliate of Macquarie and GCM in an all cash transaction valued at approximately $300 million, including debt. The transaction will result in Alaska Communications becoming a privately held company and is expected to close in the second half of 2021.

This press release features multimedia. View the full release here: https://www.businesswire.com/news/home/20201103005202/en/

Under the terms of the agreement, an affiliate of Macquarie and GCM will acquire all the outstanding shares of Alaska Communications common stock for $3.00 per share in cash. This represents a premium of approximately 57% over the closing per share price of $1.91 on November 2, 2020, the last trading day prior to the date the merger agreement was executed, and a premium of approximately 50.8% over the 30-day volume weighted average price as of November 2, 2020.

David W. Karp, Chairman of the Alaska Communications Board of Directors, said, "After carefully evaluating Macquarie Capital's and GCM's offer, we are confident that this

transaction is in the best interest of Alaska Communications and its stockholders. Macquarie Capital has a proven track record of delivering large and complex transactions globally on accelerated timelines, and GCM's Labor Impact Fund provides strategy driven capital that we expect will generate real value for our customers and the Alaska Communications workforce."

Bill Bishop, President and Chief Executive Officer of Alaska Communications, stated, "This transaction with Macquarie Capital and GCM represents an exciting opportunity to enhance our financial position and expand our resources to better serve our customers. Macquarie Capital has extensive experience navigating the complexities and issues associated with public-to-private transactions, as well as addressing the various regulatory regimes associated with communications infrastructure transactions. It also has deep telecommunications expertise and a strong track record of investing in capital intensive businesses, which will be critical as we deliver on our strategy to utilize our superior customer service and fiber-based network solutions in providing industry-leading telecommunications products and services. Finally, GCM's Labor Impact Fund provides strategic value to our business both through its experience in the telecommunications sector and in fostering partnerships with a unionized workforce. We firmly believe this transaction will allow us to enhance our expanded fiber network services and drive long-term value for our customers in Alaska and the Lower 48."

The transaction is subject to the approval of Alaska Communications' stockholders, regulatory approvals and other customary closing conditions. The transaction has fully committed debt and equity financing and is not subject to any condition with regard to financing. Equity financing will be provided by Macquarie Capital and GCM. Alaska Communications' Board of Directors has unanimously approved the agreement with Macquarie and recommends that Alaska Communications' stockholders approve the proposed merger and merger agreement. Alaska Communications expects to hold a Special Meeting of Stockholders to consider and vote on the proposed merger and merger agreement as soon as practicable after the mailing of the proxy statement to its stockholders.

Under the terms of the agreement, Alaska Communications may solicit superior proposals from third parties for a period of 30 calendar days (the "Go-Shop") continuing through December 3, 2020. In accordance with the merger agreement, Alaska Communications' Board of Directors, with the assistance of its advisors, intends to solicit superior proposals during this Go-Shop period.

TAR Holdings, LLC, which owns approximately 8.8% of the outstanding shares of Alaska Communications common stock, has entered into a voting agreement with Macquarie and GCM, among other things, to vote in favor of the merger. The voting agreement will automatically terminate upon the earliest of (a) the vote of stockholders on the merger, (b) any termination of the Merger Agreement, (c) any change in recommendation by the Board of Alaska Communications and (d) 14 months after the signing of the Merger Agreement.

**Conference Call**

The Company will host a conference call and live webcast on Thursday, November 5, 2020 at 2:00 p.m. Eastern Time to discuss the transaction and the third quarter of 2020 results. Parties in the United States and Canada can access the call at 1-800-430-8332 and enter code 1313142. All other parties can access the call at 1-323-289-6581 using the same code.

The live webcast of the conference call will be accessible from the "Events Calendar" section of the company's investor website (www.alsk.com). The webcast will be archived for 30 days. A replay of the conference call will also be available two hours after the call ends and will run until December 5, 2020 at 5 p.m. ET. To hear the replay, parties in the U.S. and Canada can call 1-888-203-1112 and enter code 1313142. All other parties can call 1-719-457-0820 and enter code 1313142.

**Advisors**

Macquarie Capital is serving as financial advisor to Macquarie Capital and GCM Grosvenor in connection with the transaction.

B. Riley Securities, Inc. is serving as financial advisor and Sidley Austin LLP is serving as legal advisor to Alaska Communications in connection with the transaction.

Goodwin Procter LLP and Morgan Lewis & Bockius LLP are serving as legal advisors to Macquarie and GCM, respectively, in connection with the transaction.

28.     On December 4, 2020, Alaska Communications issued another press release, entitled *Alaska Communications Announces Expiration of "Go-Shop" Period, Receipt of Superior Proposal and Qualification of Excluded Parties*.

29.     On December 10, 2020, Alaska Communications issued another press release, entitled *Alaska Communications Announces Entry into Amended and Restated Merger Agreement with Macquarie Capital and GCM Grosvenor to Increase Consideration to $3.20 per Share*.

30.     On December 15, 2020, Alaska Communications issued another press release, entitled *Alaska Communications Announces Receipt of Superior Proposal*.

31.     On December 22, 2020, Alaska Communications issued another press release, entitled *Alaska Communications Announces Amendment of Amended & Restated Merger Agreement with Macquarie Capital and GCM Grosvenor to Increase Consideration to $3.26 per Share*.

32.     On December 24, 2020, Alaska Communications issued another press release,

entitled *Alaska Communications Announces Receipt of Superior Proposal*.

33.     On January 4, 2021, Alaska Communications issued the press release announcing

the Proposed Transaction:

**ALASKA COMMUNICATIONS ANNOUNCES DEFINITIVE AGREEMENT TO BE ACQUIRED BY ATN INTERNATIONAL, INC. IN A $332 MILLION TRANSACTION; MERGER AGREEMENT WITH MACQUARIE CAPITAL AND GCM GROSVENOR HAS BEEN TERMINATED**

January 4, 2021

ANCHORAGE, Alaska—(BUSINESS WIRE)—Jan. 4, 2021—Alaska Communications Systems Group, Inc. (NASDAQ: ALSK) ("Alaska Communications" or the "Company") announced today that on December 31, 2020 it entered into a definitive agreement pursuant to which the Company will be acquired by a newly formed entity owned by ATN International, Inc. (NASDAQ: ATNI) ("ATN") and Freedom 3 Capital, LLC ("FC3") in an all cash transaction valued at approximately $332 million, including net debt. The merger will result in Alaska Communications becoming a consolidated, majority owned subsidiary of ATN and is expected to close in the second half of 2021. Alaska Communications' prior agreement to be acquired by an affiliate of Macquarie Capital ("Macquarie") and GCM Grosvenor ("GCM"), through its Labor Impact Fund, L.P., has been terminated.

Under the terms of the agreement, an affiliate of ATN will acquire all the outstanding shares of Alaska Communications common stock for $3.40 per share in cash. This represents a premium of approximately 78% over the closing per share price of $1.91 on November 2, 2020, the last trading day prior to the date when Alaska Communications' original merger agreement with Macquarie and GCM was executed, a 70% premium to the 30-day volume weighted average price up to and including November 2, 2020 and a 4% premium to Macquarie and GCM's prior binding agreement to acquire the Company.

The merger agreement follows the determination by the Alaska Communications Board of Directors, after consultation with its legal and financial advisors, that the ATN proposal constituted a "Superior Proposal" as defined in Alaska Communications' previously announced merger agreement with Macquarie and GCM. Consistent with that determination and following the expiration of the negotiation period with Macquarie and GCM required under such agreement, Alaska Communications terminated that agreement. In connection with the termination, Alaska Communications paid Macquarie and GCM a $6.8 million break-up fee.

David W. Karp, Chairman of the Alaska Communications Board of Directors, said, "Today's announcement is the product of a comprehensive process that demonstrates what a strong business the team at Alaska Communications has built. The agreement with ATN is a great result for our stockholders, who will receive significant near-term value."

Bill Bishop, President and Chief Executive Officer of Alaska Communications, stated, "This transaction represents an exciting opportunity to augment our market position, as well as, expand our capabilities to better serve our customers. ATN has extensive telecommunications expertise, a strong track record of successfully investing in and operating capital-intensive businesses and has a strong financial position highlighted by its net cash position. These are critical attributes that will support our strategy to deliver superior customer service utilizing our fiber-based network solutions. We firmly believe this transaction will allow us to enhance our expanded fiber network services and drive long-term value for our employees and customers in Alaska."

Michael Prior, Chairman and Chief Executive Officer of ATN, stated, "This investment and merger allows us to enter a new market with many similar characteristics to our existing operations in the U.S. and elsewhere. Further, it aligns with our strategy to leverage the broad capabilities of our operating platform to enhance and augment leading providers of facilities-based communications services in distinctive markets. ATN has a long history of enabling its subsidiaries to gain and maintain strong market positions by investing in high quality infrastructure, the latest technologies and creative solutions to give customers a superior experience. We recognize the same determination and customer-centric approach in the Alaska Communications team. Our industry is rapidly changing, and communications requirements have never been more essential and critical than they are today. We look forward to combining our resources and experience with Alaska Communications' market knowledge and reputation for superior service to provide industry-leading communications products and services to customers in Alaska and beyond."

The merger is subject to the approval of Alaska Communications' stockholders, regulatory approvals and other customary closing conditions. The merger has fully committed debt and equity financing and is not subject to any condition with regard to financing. Alaska Communications' Board of Directors has unanimously approved the agreement and recommends that Alaska Communications' stockholders approve the proposed merger and merger agreement. Alaska Communications expects to hold a special meeting of stockholders to consider and vote on the proposed merger and merger agreement as soon as practicable after the mailing of the proxy statement to its stockholders.

TAR Holdings, LLC, which owns approximately 8.8% of the outstanding shares of Alaska Communications common stock, has entered into a voting agreement with ATN agreeing, among other things, to vote in favor of the merger. The voting agreement will automatically terminate upon the earliest of (a) the vote of stockholders on the merger, (b) any termination of the Merger Agreement, (c) any change in recommendation by the Board of Alaska Communications and (d) 14 months after the signing of the Merger Agreement. Under the voting agreement, TAR Holdings, LLC may sell shares of the Company's stock in the open market through a broker dealer.

**Advisors**

Bank Street Group, LLC is serving as financial advisor and Morrison & Foerster LLP is serving as legal advisor to ATN in connection with the transaction.

B. Riley Securities, Inc. is serving as financial advisor and Sidley Austin LLP is serving as legal advisor to Alaska Communications in connection with the transaction.

## III.    The Preclusive Deal Protection Devices

34.     To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

35.     The Merger Agreement is protected by "no-shop" provisions that prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

36.     These no-shop provisions also require the Board to provide the Buyers with written notice of any Acquisition Proposal and further requires the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with the Buyers following receipt of the notice, so that they may adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

37.     In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of $4,800,000.00 with respect to any termination under the no-shop provision.  Indeed, this $4,800,000.00 payable to the Buyers would, of course, be paid in addition to the $6.8 million that Alaska Communications has already paid in connection with the termination of the Macquarie merger.

38.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a

proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

39.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**IV.     The Proxy Omits Material Information**

40.     On or about January 25, 2021, in order to convince Alaska Communications' public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

41.     Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction that implicate the Individual Defendants' conflicts of interests; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

**A.     The Proxy Omits Material Information Regarding the Background of the Proposed Transaction**

42.     The Proxy fails to provide material information regarding the background of the merger that implicates the possibility that the Merger Consideration is inadequate.

43.     The March 13, 2020 press release announcing the Proposed Transaction quotes Defendant Karp:

David W. Karp, Chairman of the Alaska Communications Board of Directors, said, "***Today's announcement is the product of a comprehensive process*** that demonstrates what a strong

business the team at Alaska Communications has built. The agreement with ATN is a great result for our stockholders, who will receive significant near-term value."

44.     However, the Proxy fails to describe the "comprehensive process" that the Board employed.  Indeed, the Merger Consideration contemplated by the Proposed Transaction greatly exceeds the consideration contemplated in the original merger agreement with Macquarie; thus, the shareholders are left uncertain whether Alaska Communications' "comprehensive process" was to execute a merger agreement that contemplated grossly inadequate consideration and hope that a potential counterparty would engage in a hostile bidding war to avoid grossly undercompensating the Company's public investors.  Given that many potential acquirors tend to avoid hostile bidding wars when possible, the Proxy fails to explain whether the "comprehensive process" that Defendant Karp was referring to was the process that was employed during the lead-up to the Macquarie merger (which clearly did not ensure maximum value to the shareholders), the go-shop process employed after the original merger was signed, or the post-go-shop "process" employed during the hostile bidding war, which apparently was used instead of a strategic review reset on the grounds that further outreach would not further maximize value to the Company's public shareholders.

> **B.     The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading**

45.     The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

46.     The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.  Specifically, the Proxy does not

disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations.  Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.  Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

47.     The Proxy omits entirely the March 2020 Projections that were prepared as part of the development of the Company's standalone plan.

48.     With respect to the July 2020 Projections, the Proxy omits critical financial projections, including the net income projections (the "Net Income Projections").  Defendants elected to summarize the projections for Alaska Communications in the Proxy, but they excised and failed to disclose the Net Income Projections.  By providing this limited summary in the Proxy and withholding the Net Income Projections, Defendants render the tables of projections on Pages 61-62 of the Proxy materially incomplete and provide a misleading valuation picture of Alaska Communications.  Simply put, net income projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

49.     With respect to the July 2020 Projections, the Proxy discloses "Adjusted Free Cash Flow" projections but fails to disclose whether the "Adjusted Free Cash Flow" projections are the same as the unlevered free cash flow projections that were used by the Financial Advisors for the discounted cash flow analysis.

50.     Further, the Proxy fails to disclose the following items used to calculate the Adjusted Free Cash Flow projections: (i) Recurring operating cash requirements, (ii) Cash income taxes refunded or paid, (iii) Cash interest paid, (iv) Amortization of capacity revenue from GCI

Liberty Inc., (v) Cash severance expense for the Company's former Chief Executive Officer, and (vi) Cash receipts and payments, deferred costs and amortized revenue and expense associated with certain prefunded special projects as defined in the 2019 Senior Credit Facility. With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

51.     This information is especially material to Alaska Communications shareholders because the Board and the Company's Financial Advisors are already on the record as having urged Alaska Communications' public investors to vote in favor of the original merger agreement, which plainly contemplated grossly inadequate merger consideration. Given that the Defendants have already touted a Fairness Opinion attempting to justify merger consideration that has already been significantly increased (on top of the termination fee), Alaska Communications' shareholders would understandably be expected to be loath to rely entirely on the conclusions of the Fairness Opinion without being armed with all of the information that the Company actually provided to the Financial Advisors.

52.     With respect to B. Riley's *Selected Public Company Analysis* beginning on Page 66, the Proxy fails to disclose (i) all of the objective criteria that B. Riley relied on in selecting the companies as "relevant," and (ii) the individual multiples for the selected companies, and (iii) B. Riley's full rationale and basis for selecting an implied Enterprise Value to 2020E Adj. EBITDA multiple range of 4.5x to 6.0x, an implied Enterprise Value to 2021P Adj. EBITDA multiple range of 4.0x to 5.5x, and an implied Enterprise Value to 2020E Adj. EBITDA – CapEx multiple range of 11.0x to 13.0x to value Alaska Communications, including whether the Adj. EBITDA – CapEx

is based on Total Capital Expenditures or Base Capital Expenditures and why B. Riley apparently disregarded many of the companies it deemed "relevant," as the selected multiples ranges appear to be well below the median multiples.

53.     The Proxy also fails to disclose that the July 2020 Projections and particularly the 2020E Adj. EBITDA – CapEx multiple analysis provide a misleadingly pessimistic view of the Company because the Company adjusted its 2020 guidance in November 2020, adjusting its 2020E Base Capital Expenditures down to $37-39 million.

54.     With respect to B. Riley's *Selected Precedent Transactions Analysis* beginning on Page 67, the Proxy fails to disclose (i) the criteria that B. Riley relied on in selecting the purportedly comparable transactions, (ii) the individual multiples in each transaction, (iii) B. Riley's full rationale and basis for selecting a LTM Adj. EBITDA multiple range of 4.5x to 6.0x, and (iv) the total enterprise value of the company acquired in each of the precedent transactions and the type of consideration (i.e., cash, stock, mix) in each transaction.

55.     With respect to B. Riley's *Discounted Cash Flow Analysis*, ("DCF") beginning on Page 68, the Proxy fails to: (i) disclose the projected unlevered free cash flow amounts, including whether B. Riley used the Adjusted Free Cash Flow projections from the July 2020 Projections or whether there is an undisclosed set of Unlevered Free Cash Flow projections, (ii) assuming the Adjusted Free Cash Flow projections were used, disclose the free cash flow projection used for the year ending December 31, 2025, (iii) fully disclose B. Riley's rationale and basis for selecting discount rate ranges from 11.5% to 12.5%, (iv) fully disclose B. Riley's rationale and basis for applying a range of EBITDA exit multiples of 4.5x to 5.5x,  and (v) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and EBITDA exit multiples.

56.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**.  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

57.     With respect to B. Riley's *Premiums Paid Analysis* beginning on Page 68, the Proxy fails to disclose (i) the individual transactions analyzed and the premium paid in each transaction, and (ii) whether B. Riley made any effort to account for the possibility that a prior announcement

that the target may be acquired would have affected the historical trading price, as B. Riley did by using the October 30, 2020 trading price for Alaska Communications.

58.      The Proxy fails to disclose whether B. Riley has performed additional financial advisory and/or other services for Alaska Communications or the Buyers during the two-year period leading up to the Proposed Transaction and, if so, the amount of compensation that B. Riley received for these services.  *See* FINRA Rule 5150(a).

59.      Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information. Thus, Defendants' omission renders the projections and summaries disclosed in the Proxy misleadingly incomplete.

60.      In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the

Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote her shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

61.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

63.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

64.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

65.     Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants

reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

66.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

67.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were

required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

68.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

69.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

70.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

72.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

73.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

75.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their

input on the content of those descriptions.

76.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

77.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

78.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: February 1, 2021

**OF COUNSEL:**

**ADEMI LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
       jfruchter@ademilaw.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**

 */s/ Juan E. Monteverde*       
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*